IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JGT, INC.                                                                                               PLAINTIFF

VERSUS                                                           CIVIL ACTION NO. 1:09cv380WJG-JMR

ASHBRITT, INC., and FEDERAL
INSURANCE COMPANY                                                                    DEFENDANTS

O R D E R

THIS CAUSE is before the Court on motion [194] of the Defendant, Ashbritt, Inc. [Ashbritt] to dismiss portions of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and the joinder [195] thereto filed by Federal Insurance Company [Federal]. Ashbritt seeks to dismiss all except the breach of contract claims as advanced in the amended complaint. (Ct. R., Doc. 194.)

Ashbritt subcontracted with Plaintiff JGT, Inc. [JGT], to assist in debris removal following Hurricane Katrina. (Ct. R., Doc. 164, p. 2.) Part of the contract between the United States Army Corps of Engineers and Ashbritt required that Ashbritt furnish a payment bond to guarantee payment to first and second tier subcontractors for debris removal work performed. (*Id*.) Ashbritt obtained this bond from Federal. (*Id*.)

JGT and Ashbritt entered into a subcontract agreement on October 9, 2005. (Ct. R., Doc. 180-2, p. 2.) JGT managed a temporary disposal site in Laurel, Mississippi. (Ct. R., Doc. 164, p. 2.) The terms of that agreement provide that the agreement be governed by the laws of the State of Florida. (Ct. R., Doc. 180-2, p. 17.) According to the allegations of the complaint, JGT was

to be the "only manager for [a temporary disposal] site." (Ct. R., Doc. 191, p. 2.) JGT contends that Ashbritt breached the contract between the parties when in spite of the agreement to pay $3.00 per yard for site maintenance and processing, that rate was "arbitrarily" cut to $2.50 per yard. (*Id*.) In addition, JGT contends that the agreed price for site remediation was not paid. (*Id*.)

Other companies were allowed to move grinders onto the site which allegedly resulted in the diversion of work from JGT. (*Id*.) JGT also claims that it purchased equipment to increase the volume of grinding at the site following Ashbritt's request for the increase. (*Id*., p. 3.) Ashbritt also did not pay the 10% retainage within 90 days following performance as required under the payment bond, according to JGT. (*Id*.) JGT claims damages for an alleged breach of contract and for willful and wanton breach of contract amounting to a tortious and independent tort allowing JGT to seek punitive damages under the law. (*Id*.)

According to Ashbritt, neither the subcontract agreement nor the amendment to the subcontract agreement guarantee a specific amount of work or provide and exclusive contract to JGT. (Ct. R., Doc. 194, p. 3.) The subcontract agreement contains a merger clause which provides as follows:

> This Agreement comprises the entire agreement between the Contractor [Ashbritt] and Subcontractor [JGT] relating to the Subcontract Work covered hereby and no other agreement, representation or understanding concerning the same has been made and no oral statement, understandings or agreement shall affect the terms hereof. Further, nothing herein shall create any relationship of agency, employment, contract, obligation or otherwise between Owner and Subcontractor.

(Ct. R., Doc. 180-2, p. 16.)

The agreement also provides that it "may not be modified or changed, except by a written instrument executed by all of the parties." (*Id*., p. 17.)

Ashbritt maintains that the agreement is governed by Florida law under the terms of the subcontract agreement. (Ct. R., Doc. 194, pp. 4-5.) The merger doctrine, parol evidence rule, and doctrine of unreasonable reliance bar the claims for loss of revenue under Florida law, according to Ashbritt. (*Id.*, p. 5.) Because Florida law controls the contract, Ashbritt maintains that any tort claim advanced by JGT, including its claim for punitive damages, must fail as a matter of law. (*Id.*)

The contract in this case provides in pertinent part as follows:

SCOPE OF SUBCONTRACT WORK

The scope of Subcontract Work shall be as follows:

Provide equipment and manpower for the purposes of emergency debris removal; collection and hauling from public rights of way and provide a temporary Debris Storage and reduction Site (TDSRS).

Provide equipment and manpower for the purposes of processing debris as directed by the Owner.

Processing of debris shall be handled as follows:

All vegetative debris will be reduced at the TDSRS by burning, grinding, or other such method as directed by the Contractor. All construction and demolition debris will be sorted and separated and reduced by compaction or separation at the TDSRS by the Contractor.

Management Services including, but not limited to, Project Management, QA/QC, Safety, ROW operations management, TDSRS operations management, haul-out operations and subcontractor management.

Subcontractor will return the sit to the original and acceptable condition as agreed by the Contractor and Owner.

(Ct. R., Doc. 180-2, p. 19.)

I.       Choice of Law

A court sitting in diversity applies the conflict rules of the state in which the suit is brought, therefore, Mississippi choice of law rules apply to this action. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The terms of the contract provides as follows with regard to choice of law:

> This Agreement shall be construed and governed by the laws of the State of Florida, without giving effect to any choice or conflict of law provision or rule. Each of the parties irrevocably consents to the non-exclusive jurisdiction of the courts of the State of Florida for the purposes of any suit, action, or proceeding relating to or arising out of this Agreement (a "Related Proceeding") and irrevocably waives, to the fullest extent it may effectively do so, (I) any objection it may have to the laying of venue of any related proceeding in any such court, and (ii) the defense of any inconvenient forum to the maintenance of any related proceeding in any such court.

(Ct. R., Doc. 180-2, p. 17, ¶ 18.4.)

Sitting in diversity, the court applies the choice of law rules of the forum state to determine which state's substantive law applies. *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 206 (5th Cir. 2007), *cert. denied* 128 S.Ct. 1231 (2008). Under Mississippi law, parties to a contract may control the substantive law applicable to the contract, so long as that state law bears a reasonable relation to the transaction. *Sorrels Steel Co., v. Great Sw. Corp.*, 906 F.2d 158, 167-8 (5th Cir. 1990). In this case, Florida is the location Ashbritt's main office and principal place of business and the Court finds that this constitutes a reasonable basis for the selection of Florida law to apply to the contract. *Kiefer v. Harris*, 125 F.3d 852 (5th Cir. 1997). The allegations of the amended complaint assert claims for breach of contract and further assert that the contract breaches were willful and wanton and amount to an independent tort. (Ct. R., Doc.

191, p. 3.)  The Court will uphold the choice of law provision within the contract and apply Florida law to the contract.

II.     General Contract Provisions

It is well-settled that when contractual language is clear and unambiguous, the court cannot indulge in construction or interpretation of its plain meaning.  *Hurt v. Leatherby Ins. Co.,* 380 So.2d 432 (Fla. 1980).  A court may not violate the clear meaning of a contract in order to create an ambiguity.  *Hoffman v. Robinson,* 213 So.2d 267 (Fla. App. 1968).  An ambiguity exists only when a word or phrase in a contract is of uncertain meaning and may be fairly understood in more ways than one and is susceptible of more than one meaning and of interpretation in opposite ways.  *Friedman, et al. v. Virginia Metal Products Corp.,* 56 So.2d 515 (Fla. 1952).  But, if a contract is unambiguous, the actual language used in the contract is the best evidence of the intent of the parties, and the contract terms will be given their plain meaning.  *Herrero v. Herrero,* 528 So.2d 1286 (Fla. Dist. Ct. App. 1988).

III.    Tort and Punitive Damage Claim

According to JGT, under Mississippi's center of gravity test, Mississippi law should govern this case in regard to the tort claims related to debris removal in Mississippi.  (Ct. R., Doc. 203, p. 3.)  The tort claim advanced in the complaint provides that the alleged contract breach amounts to an independent allowing for a punitive damage claim.  (Ct. R., Doc. 191, p. 3.)  The Court has found that Florida law applies in this case.

Under Florida law and the economic loss doctrine, parties in contractual privity are prohibited from asserting tort claims for recovery of pure economic damages, with exceptions.  *HTP, LTD v. Lieas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla. 1996).  Claims of

fraudulent inducement and negligent misrepresentation can qualify for this exception if the claimed fraud is extraneous to the contract; however, if the fraud relates to the performance of the contract, the economic loss rule applies and bars the claim. *Moransais v. Heathman,* 744 So.2d 973 (Fla. 1999).

In the event that Mississippi law should apply to the tort claim advanced by JGT in the amended complaint, the Court will analyze the outcome under Mississippi law. Mississippi law has a similar provision to the Florida law principal, although it does not bear the title of the "economic loss doctrine." To advance a claim for punitive damages connected to a breach of contract claim under Mississippi law, there must be evidence that the defendant acted maliciously or with reckless disregard for JGT's rights so that the contract breach rose above an ordinary claim for damages in connection with a party's refusal to honor contract provisions to the level of an independent tort. *See Polk v. Sexton,* 613 So.2d 841, 845 (Miss. 1993); *Hamilton v. Hopkins*, 834 So.2d 695, 703-4 (Miss. 2003).

The amended complaint advances claims that Ashbritt breached its contract with JGT by arbitrarily cutting the rate for site maintenance and site processing from $3.00/yard to $2.50/yard; failing to pay retainage within 90 days of performance; and by diverting work to other subcontractors at the site. (Ct. R. Doc. 191, pp. 2-3.) Without providing detail, JGT claims that these alleged contract breaches were willful and wanton and amount to an independent tort under Mississippi law. (*Id*.) . JGT contends that it was informed via Charles Tigret, whose capacity with JGT is not explained in the amended complaint, that JGT would be the only manager for the site. (*Id*.) Tigret avers that he was informed that JGT would have an exclusive contract for the

site at the Jones County airport, and claims he entered the contract in reliance on that representation. (Ct. R., Doc. 203-2, Exh. A.)

According to Tigret's affidavit, in December 2005, Dwight Anderson, an Ashbritt executive, told Tigret that JGT was being released from the site and new grinders would be brought in to "pick up the pace." (*Id*.) Tigret argued with Anderson over this statement and indicated that JGT would not give up the pit. (*Id*.) D&J was allowed to deliver and operate a grinder at the Laurel temporary disposal site. (*Id*.) JGT purchased a second grinder for the site around the same time. (*Id*.)

Another subcontractor, Coastal, placed a grinder at the facility in subsequent months. Following this, Tigret complained to Jimmy Star, an Ashbritt executive, about a breach of the JGT exclusive contract to operate on the facilities. (*Id*.) Tigert claims that Ashbritt agreed to remove the other contractors from the site, apparently because JGT purchased the additional grinders. (*Id*.) Instead, Coastal was allowed to deliver additional grinders to the site and the other contractors continued to operate there. (*Id*.) Tigert asserts that Ashbritt breached agreements because it did not remove the other grinders from the site and diverted work to the other contractors on the site, and because it did not pay the retainage within 90 days after performance of the contract as required by the bond issued for the job . (Ct. R., Doc. 191, pp. 2-3.)

Under Mississippi law, there must be a showing of some intentional wrong, insult, abuse or gross negligence which amounts to an independent tort to justify recovery in a claim for punitive damages. There is no evidence of this contained in the allegations of the complaint.

Furthermore, under Florida law, a plaintiff must provide the court with an evidentiary basis for punitive damages before a court may allow a claim for punitive damages to be included in a plaintiff's complaint. *Cypress Aviation, Inc. v. Bollea*, 826 So.2d 1091, 1092 (Fla. Dist. Ct. App. 2002); *Espirito Santo Bank v. Rego*, 990 So.2d 1088, 1091 (Fla. Dist. Ct. App. 2007). The Court finds that, at best, JGT has alleged that Ashbritt breached the terms of the contract between the parties but has not shown that the defendant acted maliciously or with reckless disregard for JGT's rights lifting the contract breach above an ordinary claim for damages in connection with a party's refusal to honor contract provisions to the level of an independent tort. Accordingly, the Court finds that the motion to dismiss the tort claim and its associated claim for punitive damages should be granted.

IV.     Evidence of Exclusive Arrangement

JGT contends that because the contract is silent in regard to whether JGT had an exclusive contract, neither the merger rule nor the parol evidence rule apply under Florida law. (Ct. R., Doc. 203, pp. 3-4.) In addition, JGT argues that it operated at the site since the contract signing under a verbal agreement of exclusivity. (*Id*., p. 5.) Then, in December 2005, the agreement was amended when Ashbritt verbally agreed to remove the other grinders following JGT's purchase of a second grinder for use at the site. (*Id*., p. 6 and Doc. 203-2.) JGT contends that it purchased the second grinder as a direct result of the other contractors moving onto the site. (Ct. R., Doc. 203, p. 6.) According to Tigret, Star, an Ashbritt executive, indicated that the other contractors would be released after JGT purchased the second grinder. (Ct. R., Doc. 203-2.) There is no evidence presented to the contrary by Ashbritt.

When the language of a contract is clear and unambiguous, the intent or meaning of a written document is determined solely from the language of the instrument. *Reid v. Barry*, 93 Fla, 849, 112 So. 846 (1927). The parol evidence rule prohibits a party to a contract from varying terms of that contract by alleging that oral agreements were made which differ from the written terms of the contract. *Carlon, Inc. v. Southland Diversified Co.*, 381 So.2d 291, 293 (Fla. Dist. Ct. App. 1980). "The parol evidence rule applies to verbal agreements between the parties to a written contract which are made before or at the time of execution of the contract. It does not apply to the admission of subsequent oral agreements that alter, modify, or change the former existing agreement between the parties." *Pavolini v. Williams,* 915 So.2d 251, 254 (Fla. Fla. Dist. Ct. App. 2005). The alleged change in the agreement between the parties occurred around December 2005. (Ct. R., Doc. 191, p. 2.) Evidence of an oral modification can be considered by the court to determine whether the contract was subsequently amended or modified, and if there are any issues of material fact in dispute as a result. *See J. Lynn Const., Inc. v. Fairways at Boca Golf & Tennis Condo. Ass'n, Inc*., 962 So.2d 928, 930-1 (Fla. Dist. Ct. App. 2007).

In this case, JGT contends that in December 2005 other contractors were brought onto the site to process the material. (Ct. R., Doc. 203-2.) Viewing the facts as pleaded in the light most favorable to the non-moving party, a motion to dismiss should not be granted if a complaint provides "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 1949-50, (2009). Viewing the circumstances in the light most favorable to JGT, there is a chance that an oral modification of the contract occurred in which Ashbritt promised that JGT would be

the exclusive operator at the site. The Court, therefore, concludes that the motion to dismiss the alleged exclusive contract should be denied. It is, therefore,

ORDERED AND ADJUDGED that the motion [193] to dismiss portions of Plaintiff's complaint including its claims for bad faith, punitive damages, and an alleged exclusive contract to perform the work at the Laurel work site filed by Defendant Ashbritt, and the joinder [194] in that motion by Federal, be, and is hereby, granted in part and denied in part. It is further,

ORDERED AND ADJUDGED that the motion to dismiss the claims for bad faith tort in connection with the contract and for punitive damages be, and is hereby, granted. It is further,

ORDERED AND ADJUDGED that the motion to dismiss claims for an alleged breach of an exclusive contract to perform work be, and is hereby, denied. It is further,

ORDERED AND ADJUDGED that each party bear its respective costs associated with this motion.

SO ORDERED AND ADJUDGED, this the 21st day of April, 2010.

*Walter J. Gex III*
UNITED STATES SENIOR DISTRICT JUDGE